UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PETER VANAMBURGH JR.,

Plaintiff,

v.

UNITED PARCEL SERVICE, INC.;
LEXISNEXIS RISK SOLUTIONS, INC.;
HIRERIGHT, LLC; and
SAMBASAFETY, INC.,

Defendants.

Civil Action No. ______________

JURY TRIAL DEMANDED

**COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT, 15 U.S.C. §§ 1681 ET SEQ.**

## INTRODUCTION

This action arises from Defendant United Parcel Service, Inc.'s [UPS] systematic violations of the Fair Credit Reporting Act [FCRA], 15 U.S.C. §§ 1681 et seq., spanning Plaintiff's twelve-year employment as a UPS package car driver. Working with three successive consumer reporting agencies — LexisNexis Risk Solutions, Inc. [LexisNexis], HireRight, LLC [HireRight], and SambaSafety, Inc. [SambaSafety] — UPS procured annual motor vehicle records regarding Plaintiff for employment purposes without ever providing a clear and conspicuous standalone disclosure as required by 15 U.S.C. § 1681b(b)(2)(A). UPS embedded consumer report authorizations in multi-purpose DOT certification forms and onboarding packages, none of which satisfied the statutory standalone requirement.

Most critically, on February 9, 2022 — the same calendar date on which UPS's automated annual batch had run in 2018 and 2019 — SambaSafety procured a motor vehicle record on Plaintiff before UPS presented Plaintiff with any authorization form for that year. No authorization of any kind existed at the moment of procurement. When UPS subsequently

demanded Plaintiff's signature on a defective 2022 eForm, the consumer report for that cycle was already in UPS's possession. Plaintiff refused, and was held out of service without pay. In July 2022, Plaintiff signed and returned a prior-year version of the certification form containing the complete DOT driving-record certification required by 49 C.F.R. § 391.27 — and UPS rejected it, solely because it lacked the embedded consumer report authorization. Only on August 19, 2022, after months without pay and on the advice of counsel retained by his union's Joint Council — the same counsel who had simultaneously advised against arbitrating his grievances — did Plaintiff sign the 2022 eForm under protest, as the sole condition of returning to work. A signature extracted under economic duress, six months after the procurement it purported to authorize, is not the voluntary, prior, written authorization the FCRA requires. It is the documentation of the violation.

The automated nature of UPS's consumer report procurement program — evidenced by a batch processing account listing a fictional telephone number [(918) 555-5555] and a blackhole email address [blackhole@hireright.com], operated under the non-human account name 'Annual MVR User Only' — establishes that no individual authorization was ever reviewed before any pull was submitted. UPS's own internal hotline records confirm that employees at Plaintiff's facility understood the 2022 MVDC to be seeking authorization for 'every kind of investigating report,' not merely driving records. UPS's own HR portal established internally on May 9, 2022 that the signature UPS was demanding was not required by federal law. UPS demanded it anyway, rejected a fully DOT-compliant certification because it lacked the consumer report rider, and conditioned Plaintiff's livelihood on retroactive consent to a violation already completed.

## PARTIES

1. Plaintiff Peter VanAmburgh Jr. is an individual residing at 70 Ferry Road, Salisbury, Massachusetts 01952. At all relevant times, Plaintiff was employed by UPS as a full-time

package car driver, represented by Teamsters Local Union No. 42, working out of UPS's facility at 110 Kimball Lane, Lynnfield, Massachusetts. His UPS employee ID is 3672620.

2. Defendant United Parcel Service, Inc. [UPS] is a corporation organized under the laws of Delaware with its principal place of business at 55 Glenlake Parkway NE, Atlanta, Georgia 30328. UPS operates package delivery facilities throughout Massachusetts, including at 110 Kimball Lane, Lynnfield, Massachusetts (District 07/36 NORTHEAST). At all relevant times UPS was Plaintiff's employer and a user of consumer reports within the meaning of 15 U.S.C. § 1681a.

3. Defendant LexisNexis Risk Solutions, Inc. [LexisNexis] is a consumer reporting agency within the meaning of 15 U.S.C. § 1681a(f), incorporated in Georgia, with its principal place of business at 1000 Alderman Drive, Alpharetta, Georgia 30005. LexisNexis may be served through its registered agent CT Corporation System, 155 Federal Street, Suite 700, Boston, Massachusetts 02110. LexisNexis procured motor vehicle records regarding Plaintiff for UPS under account number 990059MNC in at least 2011.

4. Defendant HireRight, LLC [HireRight] is a consumer reporting agency within the meaning of 15 U.S.C. § 1681a(f), organized in Delaware. HireRight may be served through its registered agent Corporation Service Company, 84 State Street, Boston, Massachusetts 02109. HireRight processed annual motor vehicle record requests for UPS under a batch account identified as 'Annual MVR User Only' in at least 2017, 2018, 2019, and 2020.

5. Defendant SambaSafety, Inc. [SambaSafety] is a consumer reporting agency within the meaning of 15 U.S.C. § 1681a(f), incorporated in Colorado, with a mailing address of PO Box 1970, Rancho Cordova, California 95741. SambaSafety may be served through its registered agent as identified by the Colorado Secretary of State. SambaSafety processed motor vehicle record requests for UPS under account E7577 on March 18, 2021 and February 9, 2022. The February 9, 2022 pull preceded UPS's presentation of any authorization form to Plaintiff for that annual cycle.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, including Plaintiff's employment at the Lynnfield facility, procurement of consumer reports regarding Plaintiff in this district, the adverse actions taken against Plaintiff, and UPS's denial of Plaintiff's personnel file requests.

8. Plaintiff respectfully requests assignment to the Honorable Julia E. Kobick as a related case to *VanAmburgh v. Teamsters Union 25 Health Services and Insurance Plan*, No. 1:26-cv-11906-JEK (D. Mass.), pursuant to Local Rule 40.1(g). The actions share a nucleus of operative fact, common witnesses, and a preservation order already entered by that Court.

## STANDING

9. Plaintiff's injuries are concrete within the meaning of Article III and *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). The February 9, 2022 procurement acquired Plaintiff's personal information — his complete state driving record, license history, and physical descriptors — with no authorization of any kind in existence at the moment of acquisition. The unconsented acquisition of an individual's personal information bears a close relationship to the harm addressed by the common-law tort of intrusion upon seclusion, a traditional basis for lawsuits in American courts that *TransUnion* expressly recognizes as concrete.

10. This is not a case in which a consumer would have authorized the procurement had a compliant disclosure been made. When asked, Plaintiff refused — repeatedly, in writing, at the cost of his pay and ultimately his employment. The violations deprived Plaintiff of a statutory choice he demonstrably would have exercised, and did exercise the moment it was presented to him.

11. The violations also produced tangible downstream harm: removal from service without pay beginning April 2022, the conditioning of Plaintiff's reinstatement on retroactive authorization of a completed unauthorized procurement, and the cascade of adverse actions and economic losses set forth in the Damages section below. Plaintiff's injuries are concrete, particularized, actual, and directly traceable to Defendants' conduct.

## FACTUAL ALLEGATIONS

### A. UPS's Annual Motor Vehicle Record Program

12. UPS operates a continuous annual motor vehicle record [MVR] program requiring all driver-employees to submit to annual consumer report procurement. Under this program, UPS submits employee identifying information to a consumer reporting agency, which obtains the employee's motor vehicle record from the applicable state registry and returns it to UPS. A motor vehicle record obtained through a consumer reporting agency constitutes a consumer report within the meaning of 15 U.S.C. § 1681a(d). UPS is a user of those consumer reports.

13. UPS conducted this MVR program with respect to Plaintiff continuously from hire in 2010 through at least 2022, using three successive consumer reporting agencies. The complete documented pull record, as produced by UPS on October 24, 2024 in prior administrative proceedings before the Massachusetts Commission Against Discrimination [MCAD], Docket No. 23BEM02304, is as follows:

| Date | CRA | Request / Account ID | Requester | Result |
|---|---|---|---|---|
| May 12, 2011 | LexisNexis | ESD# 22626658, Acct 990059MNC | Unknown | Clear |
| Sep 29, 2011 | LexisNexis | ESD# 26046038, Acct 990059MNC | Unknown | Clear |
| 2012–2016 | Unknown CRA | NOT PRODUCED | Unknown | Unknown |
| Mar 6, 2017 | HireRight | HE-030617-977DA, Pkg: MVR Batch | John Peil, jpeil@ups.com | Clear |
| Feb 9, 2018 | HireRight | HE-020818-UN444, Pkg: Custom | Annual MVR User Only, holley.townes@hireright.com | Clear |

| | | | | |
|---|---|---|---|---|
| Feb 9, 2019 | HireRight | HE-020819-KD2BH, Pkg: Custom | Annual MVR User Only, (918) 555-5555 | Clear |
| Feb 8, 2020 | HireRight | HE-020720-CN3PP, Pkg: Custom | Annual MVR User Only, blackhole@hireright.com | Clear |
| Mar 18, 2021 | SambaSafety | E7577, Ctrl: A0AQJU | Unknown | Clear |
| Feb 9, 2022* | SambaSafety | E7577, Ctrl: BSR2QI | Unknown | Clear |

* The February 9, 2022 pull occurred before UPS presented any 2022 authorization form to Plaintiff, and on the same calendar date as UPS's 2018 and 2019 annual batch pulls. See Sections F and G, infra.

14. UPS's Annual Driver Review Certifications, produced in the same October 24, 2024 production, identify by name the UPS representatives who reviewed Plaintiff's MVR in each cycle to determine whether minimum safe driving requirements were met: Heather Purvis Reed (Review Date March 10, 2017); Trebor Finger (Review Date March 16, 2018); Travis Barnhart (Review Date February 28, 2019); and Caleb McKay (Review Date February 25, 2020). Each certification states that the representative 'reviewed the driver's record [MVR]' — establishing that identified UPS personnel received and used each consumer report in employment fitness determinations.

15. CRA-sourced MVR reports for the years 2012 through 2016 were not produced in prior proceedings. The review certifications for those years certify that a review of the MVR occurred, establishing that CRA procurement happened in each of those years. The underlying CRA reports for 2012–2016 are within UPS's sole possession and are compellable through discovery.

**B. The Three Defective Authorization Documents**

16. At no point during Plaintiff's employment did UPS provide Plaintiff with a clear and conspicuous disclosure in a document consisting solely of the disclosure that a consumer report would be obtained for employment purposes, as required by 15 U.S.C. § 1681b(b)(2)(A). UPS relied on three separate documents, none of which satisfies the standalone requirement.

17. **The 2010/2011 Onboarding FCRA Disclosure.** On or about September 16, 2010, and again on or about September 29, 2011, Plaintiff signed a document titled 'Disclosure to Applicant / Applicant's Authorization in Accordance with 15 U.S.C. 1681b(b)(2)(A)' (UPS Form No. 016129103, Rev. 7/01) [Onboarding Disclosure]. The Onboarding Disclosure was an applicant-at-hire, one-time authorization. Its language is directed to an applicant and a prospective employer, not a current employee and a continuing employer. Its scope does not extend to authorization for annual re-procurement of consumer reports during twelve years of continuous employment. UPS relied on this single applicant-at-hire document as the legal basis for at minimum twelve consecutive annual MVR pulls.

18. UPS produced two versions of the Onboarding Disclosure in prior proceedings: one with Plaintiff's Social Security Number unredacted, produced from the files of Teamsters Local Union No. 42 Business Agent Joseph Benevento, and one with the SSN redacted from UPS's own file. The unredacted version's presence in Benevento's union file — a file shared with UPS and with law firm Feinberg, Dumont & Brennan in the context of advising on Plaintiff's MVDC dispute — constitutes an unauthorized disclosure of Plaintiff's FCRA onboarding documentation to third parties outside the scope of any employment-purpose authorization.

19. **The 2018 Agreement and Policy Acknowledgement.** On or about September 27, 2018, Plaintiff signed a multi-topic document titled 'Agreement and Policy Acknowledgement' (UPS Form Doc-7, APA 1.0) [APA] containing: (a) an Applicant's Agreement; (b) a Honesty in Employment policy; (c) a Professional Conduct and Anti-Harassment Policy; and (d) embedded within these provisions, an 'APPLICANT'S AUTHORIZATION IN ACCORDANCE WITH 15 U.S.C. 1681b(b)(2)(A).' The APA is not a document consisting solely of the disclosure. It does not satisfy § 1681b(b)(2)(A) regardless of the statutory citation appearing in its heading. The form, not the title, controls.

20. **The 2021/2022 MVDC eForm.** Beginning in 2021, UPS converted its annual Motor Vehicle Driver Certification [MVDC] from a paper form to an electronic form [eForm]

delivered through UPS's internal digital platform. The paper MVDC forms Plaintiff signed in prior years — including the 2014 through 2019 versions in UPS's own production — contained exclusively the DOT driving-record certification required by 49 C.F.R. § 391.27, with no consumer report authorization of any kind. The eForm added an open-ended consumer report authorization within the same document as the DOT certification language, including an evergreen clause stating that UPS could obtain 'driving records and reports' about Plaintiff 'at any time' for the remainder of employment.

21. UPS's own internal ELT Hotline records, produced in MCAD proceedings, document a UPS employee's summary of Plaintiff's objection: 'But this year the MVDC got a whole lot bigger where every kind of investigating report was being asked.' The same hotline record states: 'The building he works at was getting employee permissions to run background checks.' This is not Plaintiff's characterization — it is UPS's own internal record describing what the 2022 eForm sought: a broad background check authorization beyond driving records.

22. When Plaintiff identified the embedded consumer report authorization and requested the 'separate Disclosure of Intention to Obtain Driving Records for Employment Purposes' referenced in the eForm's own text, UPS produced a document bearing no revision number, barcode, form number, signature line, or official document control designation — none of the identifying features of UPS's legitimate FCRA disclosure forms. The document was manufactured in response to Plaintiff's specific statutory demand.

**C. The Automated 'Blackhole' Account and Batch Processing System**

23. Beginning no later than 2017, UPS processed its annual MVR program through HireRight under an account with the following identifying information, as shown on the face of HireRight's returned reports: Requester Name: 'Annual MVR User Only'; Phone: (918) 555-5555; Email (2018–2019): holley.townes@hireright.com; Email (2020): blackhole@hireright.com. The phone number (918) 555-5555 is a 555-series number. 555-series numbers do not exist in the United States public telephone system; they are reserved

by convention for fictional use. UPS registered a consumer reporting account for use in procuring consumer reports on thousands of employees using a telephone number that is, by design, unreachable by any actual caller.

24. The 2017 pull (HE-030617-977DA) was submitted as an 'MVR Batch' package by John Peil, identified as UPS-HR Technology. The 'Batch' designation confirms that UPS was running simultaneous consumer report requests across its entire driver workforce, not individual employment decisions. The transition from a named human requester to the anonymous 'Annual MVR User Only' account with a fictional phone number reflects UPS's deliberate decision to fully automate the procurement process, eliminating any human checkpoint at which authorization compliance could have been verified.

25. The batch system's calendar fingerprint confirms its operation: UPS's annual pulls ran on February 9, 2018; February 9, 2019; February 8, 2020 — and February 9, 2022. The 2022 procurement executed on the standing annual batch date, to the day, demonstrating that it was queued and processed by the automated system without regard to whether any authorization existed for that cycle. The HireRight activity log for the 2020 cycle shows the request submitted at 8:13 PM and completed at 8:38 AM the following morning — overnight machine processing with no identified human recipient and no recorded adjudication.

**D. UPS's Internal Knowledge That the Demand Was Not Required by Federal Law**

26. On May 9, 2022, an entry in UPS's own HR portal established internally that the signature UPS was demanding from Plaintiff was not required by federal law. Despite this internal admission, UPS management — including Safety Director Amy Madeira — continued to represent to Plaintiff, to union officials, and to federal and state agencies that the form was a mandatory federal DOT requirement.

27. On July 18, 2022, Plaintiff sent UPS an email explicitly citing 'title 15 USC, Federal trade commission' and describing the eForm's lack of a separate disclosure. This email was forwarded internally to UPS's Executive Leadership Team Hotline (SXD3RLW). Division

Manager Ken Burrows's internal response the same day did not dispute Plaintiff's legal characterization. UPS had actual written notice of the specific FCRA provision before it finalized any disciplinary outcome.

28. UPS's internal ELT Hotline investigation (Case 2022-8-61090), categorized as 'Destruction/Falsification/Removal of Records,' was investigated internally by the same compliance specialist who subsequently classified Plaintiff's FCRA citations as 'Reporter Misperception,' and was closed in 24 days with a green alert. The same compliance specialist was then assigned to investigate Plaintiff's separate unfair termination complaint.

**E. The Rejected DOT-Compliant Certification: UPS's Own Conduct Proves the Form's Purpose**

29. On April 1, 2022, Plaintiff was told he could not work until he signed the 2022 eForm. Plaintiff refused to authorize the embedded consumer report procurement and was held out of service without pay. UPS's own Workday business-process records document disciplinary process completions on January 12, 2022, April 21, 2022, and August 16, 2022, and its Manager Evaluation records list disciplinary actions designated 'Written Warning,' 'Termination,' and 'Termination' against Plaintiff — records UPS maintained while simultaneously representing in sworn administrative filings that Plaintiff 'was never terminated.'

30. In July 2022, following Plaintiff's hotline complaint, UPS Geo Services Supervisor Lola Delans offered Plaintiff the option of signing a paper copy of the MVDC. Plaintiff agreed. Two days later, Plaintiff signed and returned a prior-year version of the MVDC — the version containing the complete DOT driving-record certification required by 49 C.F.R. § 391.27, and containing no consumer report authorization. By UPS's own investigation record, Safety Director Amy Madeira and Labor Director Rich Murray rejected the signed certification, and Plaintiff 'continued to stay out of work without pay.'

31. This event, documented entirely in UPS's own records, is dispositive of the form's purpose. Plaintiff signed the actual federal requirement: a complete, written DOT driving-record certification. UPS rejected it for one reason only — it lacked the embedded consumer report authorization. UPS thereby established through its own conduct that: (a) the form demand was never about DOT compliance, which Plaintiff satisfied in full; (b) the 'insubordination' for which Plaintiff was held out of work consisted solely of his refusal to authorize consumer report procurement; and (c) UPS's representations that the demand was a mandatory federal requirement were knowingly false, consistent with its own May 9, 2022 internal admission.

**F. The February 9, 2022 Procurement Without Any Contemporaneous Authorization**

32. SambaSafety procured a motor vehicle record on Plaintiff on February 9, 2022, as documented by SambaSafety's own record (Account E7577, Control Number BSR2QI, Order Date 02/09/2022). This pull was processed with a blank 'Reference:' field — no authorization document reference number was logged against this pull at the time of procurement.

33. At the moment SambaSafety processed the February 9, 2022 request, Plaintiff had not been presented with the 2022 eForm, had not signed any 2022 authorization, and had not consented to any 2022 consumer report procurement. The only potentially applicable authorization document was the 2010/2011 Onboarding Disclosure — a one-time applicant-at-hire authorization whose scope does not extend to annual employment-phase procurement. The February 9, 2022 pull was procurement with no contemporaneous authorization whatsoever — not merely defective disclosure, but complete absence of authorization at the moment of procurement.

**G. The August 19, 2022 Signature Under Protest: Retroactive Consent Extracted by Economic Duress**

34. When UPS demanded Plaintiff's signature on the 2022 eForm beginning April 1, 2022, the consumer report for that annual cycle had already been procured and was in UPS's

possession. The eForm demand was therefore not a prospective authorization for a future pull — it was a retroactive demand for authorization of a pull already completed without Plaintiff's consent. The FCRA requires written authorization before procurement. 15 U.S.C. § 1681b(b)(2)(A). There is no provision for retroactive authorization.

35. On August 12, 2022, the law firm Feinberg, Dumont & Brennan [FDB], acting as counsel to Teamsters Joint Council No. 10, issued a letter advising that Plaintiff's grievance 'has no merit,' characterizing his refusal to sign the eForm as insubordination, and recommending against arbitration. All of Plaintiff's grievances were closed the same day the letter was written, without FCRA analysis. Plaintiff was thereafter advised by union counsel that the only path back to work was to sign the form.

36. On August 19, 2022, after more than four months without pay, Plaintiff signed the 2022 eForm under protest, as the sole condition of returning to work, on the advice of the same union counsel who had simultaneously foreclosed his grievances. UPS's own hotline intake record documents that Plaintiff signed 'under great protest.'

37. The August 19, 2022 signature is void as authorization and is itself evidence of the violation. It was extracted under economic duress as the price of ending an unpaid suspension; it was executed six months after the February 9, 2022 procurement it purported to authorize; and it followed UPS's rejection of a fully DOT-compliant certification, its May 9 internal admission, and its receipt of Plaintiff's written FCRA citation. A consent that is neither voluntary nor prior is not the authorization 15 U.S.C. § 1681b(b)(2)(A) requires. UPS's procurement and retention of a signature it knew to be legally ineffective — to paper a procurement it knew to be unauthorized — is itself probative of willfulness under *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007).

**H. The Coordinated Suppression of Plaintiff's FCRA Claims**

38. On August 31, 2022, UPS Security Supervisor Brian Sardini documented: 'UPS Security discussed the case with Labor and the Operations Management team. Both agreed that this is a

Labor / Union issue.' This joint classification routed Plaintiff's federal consumer protection claim into a labor grievance channel incapable of adjudicating FCRA claims.

39. In its Position Statement submitted to MCAD under oath, verified by UPS Legal Project Manager Elizabeth Troutman Staley on October 16, 2024, UPS stated: 'The Teamsters Union negotiated with UPS to return VanAmburgh to work.' This sworn admission confirms that a negotiated agreement — not a unilateral federal compliance requirement — governed the eForm demand, and that UPS knew the demand was legally contestable.

**I. Adverse Action Without Pre-Adverse Action Notice**

40. On September 23, 2022, Plaintiff was removed from work. UPS Corporate Security opened Investigation Case No. 22-NOT-5487, classifying the matter as 'Violent Acts.' The Corporate Security Investigation Report is filed as Exhibit L in the related federal case, No. 1:26-cv-11906-JEK. UPS's own hotline records document that Business Manager Paul Hurton 'determined that Peter was not safe to drive' — a driving-fitness determination of precisely the kind UPS's annual MVR program exists to inform, made while UPS held the unauthorized February 9, 2022 consumer report and the entire MVR history procured under the program.

41. UPS conditioned Plaintiff's return to work on production of a mental health clearance. On October 12, 2022, Plaintiff submitted a doctor's note, which UPS rejected as 'not on letterhead' and not appearing 'authentic.' UPS's records further document that Plaintiff was marked as remaining on family leave without his knowledge after his FMLA entitlement was exhausted. Plaintiff was constructively discharged on October 24, 2022. UPS's exit interview record of October 27, 2022 documents Plaintiff's contemporaneous characterization of the separation as a constructive discharge.

42. Throughout 2022, UPS possessed, reviewed, and relied upon consumer reports regarding Plaintiff — including the unauthorized February 9, 2022 report — in assessing his fitness for duty, through the named-reviewer certification process described in Paragraph 14 and the fitness determinations described above. The adverse actions of 2022 — the April removal from

service, the September 23 removal, the reinstatement conditions, and the constructive discharge — were inseparable from the 2022 consumer report cycle: Plaintiff was removed for refusing to authorize the very report UPS had already procured and held, and his reinstatement was conditioned on validating that procurement. At no time before any of these adverse actions did UPS provide Plaintiff a copy of any consumer report or a written description of his rights under the FCRA, despite the pre-adverse-action notice requirement printed on the face of the LexisNexis reports UPS received, and despite FCRA notice language appearing on the face of the HireRight reports UPS received.

**J. Denial of Records; TSA Scope; Post-Termination Access**

43. Plaintiff demanded his personnel file — which contained his consumer reports and the authorization documents — beginning in approximately March 2022, and his demand is documented in UPS's own April 2022 hotline intake ('He had asked for his employer record as well, but they refused to give it to him'). M.G.L. c. 149, § 52C required production within five business days. Contemporaneous text messages of June 17, 2022 document that UPS suspended Plaintiff the Friday following a Monday file request, with the file still unproduced. UPS did not produce the personnel file for over five months. The file contained the May 9, 2022 HR portal entry, the MVR pull records, and the internal case management records necessary to discover the FCRA violations.

44. UPS is a Full All-Cargo Aircraft Operator subject to the TSA's Full All-Cargo Aircraft Operator Standard Security Program. UPS's internal employee portal, captured by Plaintiff prior to separation, confirmed on October 22, 2022 that a TSA Security Threat Assessment was being processed as to Plaintiff. The eForm's evergreen authorization clause, embedded in a DOT certification form, was the instrument UPS used to support both standard MVR procurement and broader investigative processing — corroborating UPS's own hotline record describing the eForm as seeking 'every kind of investigating report.' At hire, UPS also obtained Plaintiff's consent for previous-employer safety, accident, and drug/alcohol testing history

investigation through ChoicePoint (now LexisNexis) investigators — an additional investigative procurement channel whose complete output has never been disclosed to Plaintiff.

45. Records obtained from the Massachusetts Registry of Motor Vehicles document repeated access to Plaintiff's restricted personal information after his October 24, 2022 separation. The originator of each post-separation access is identifiable from RMV Atlas system logs and is a subject of discovery in this action. Plaintiff's employment-purpose relationship with UPS, and any arguable authorization, terminated no later than October 24, 2022.

## STATUTE OF LIMITATIONS AND TOLLING

46. The FCRA provides that a civil action must be brought within the earlier of: (1) two years from the date of discovery of the violation, or (2) five years from the date the violation occurred. 15 U.S.C. § 1681p.

47. **The claims at the core of this action are timely on the face of the statute.** The February 9, 2022 procurement without any contemporaneous authorization; the furnishing of that report by SambaSafety; the extraction and use of the void August 19, 2022 retroactive authorization; and the 2022 adverse actions taken without pre-adverse-action notice all occurred within five years of this filing. As to the two-year discovery prong, Plaintiff did not discover — and could not with reasonable diligence have discovered — the facts constituting the violations until October 24, 2024, when UPS produced its complete internal file in MCAD proceedings, including the CRA reports bearing the request IDs, order dates, account numbers, blank reference fields, and requester identities pleaded herein. The four document productions bear scan timestamps of October 24, 2024. Two years from October 24, 2024 is October 24, 2026. This action is timely.

48. **The pre-2022 procurements are pleaded in two capacities.** First, regardless of their independent actionability, the 2011 through 2021 procurements are admissible and pleaded as

evidence of willfulness: twelve consecutive years of automated procurement under documents UPS knew did not satisfy the standalone requirement bears directly on the recklessness of the timely violations under *Safeco*. Second, and in the alternative, Plaintiff asserts that the limitations period for the pre-2022 procurements is equitably tolled by UPS's fraudulent concealment, as set forth below. Plaintiff acknowledges that application of equitable tolling to § 1681p's five-year limit presents a legal question for the Court; the willfulness use of the same facts presents none.

49. UPS's affirmative acts of concealment, each documented in the record, prevented Plaintiff from discovering the factual predicate for his FCRA claims before October 24, 2024:

(a) **Personnel File Denial (2022).** UPS denied Plaintiff access to his personnel file for over five months in violation of M.G.L. c. 149, § 52C. The file contained the May 9 portal entry, the CRA pull records, and the internal case notes necessary to establish the FCRA violations. A defendant cannot invoke a limitations period it manufactured by withholding the records that would start the clock.

(b) **'Labor/Union Issue' Classification (August 31, 2022).** UPS and union officials jointly classified Plaintiff's federal consumer protection claim as a 'Labor / Union issue' and routed it into a grievance channel incapable of adjudicating FCRA claims. The FDB opinion letter closed all grievances without FCRA analysis. Deliberate jurisdictional mislabeling of a federal statutory claim is affirmative concealment.

(c) **Fabricated 'Separate Disclosure' Document.** When Plaintiff specifically demanded the separate FCRA disclosure referenced in the eForm's own text, UPS produced a document bearing none of the characteristics of a legitimate UPS FCRA form. Producing a fabricated compliance document in response to a specific statutory demand is affirmative concealment.

(d) **Misrepresentation of Legal Necessity.** After its own May 9, 2022 internal record established that the demanded signature was not required by federal law, UPS continued to represent the form as a mandatory federal DOT requirement — and rejected Plaintiff's signed, fully DOT-compliant prior-year certification, conduct irreconcilable with the stated justification.

(e) **NLRB Jurisdictional Capture (November 2022).** UPS presented Plaintiff's NLRB charges (Case 01-CA-300705) exclusively through a labor compliance narrative. The NLRB, operating within its Section 7/8(a) mandate, evaluated a labor dispute, not an FCRA claim. The NLRB's dismissal is not preclusive on any FCRA issue and was the foreseeable result of UPS's framing.

(f) **Exit Interview — Suspicion Without Evidence (October 27, 2022).** UPS's own exit interview record documents Plaintiff naming specific actors, characterizing his treatment as 'gaslighting,' and answering 'Don't Know / Don't Wish To Disclose' to whether anyone had tried to conceal the issue. This UPS-authored record establishes that Plaintiff had specific suspicion but not evidence — because UPS held the records that would convert suspicion to proof.

(g) **Internal Self-Investigation (2022).** The ELT Hotline investigation into Plaintiff's records concern was conducted by the compliance specialist who classified his FCRA citations as 'Reporter Misperception,' closed the matter in 24 days with a green alert, and was then assigned to investigate Plaintiff's unfair termination complaint.

(h) **EAP Records Concealment (February 2025 – April 2026).** From February 2025 through April 2026, Plaintiff's access to clinical records documenting the coordination between the EAP, union officials, and UPS Corporate Security was blocked by an unlawful notarization requirement expressly prohibited by HHS guidance. A revised authorization form removing the most relevant records category

appeared two days before Plaintiff filed a related federal action in April 2026.

50. Plaintiff contemporaneously documented his diligence. Plaintiff filed NLRB charges, a CFPB whistleblower complaint, an AGO complaint, MCAD charges, multiple written demands for his personnel file, and a written litigation hold demand to UPS's counsel — all in real time. A plaintiff who suspects wrongdoing, pursues every available institutional avenue, and is blocked at each one by the defendant's control over the proof has not failed to exercise due diligence. He has been denied the product of diligence.

**COUNT I**
**Violation of 15 U.S.C. § 1681b(b)(2)(A)**
**Procurement of a Consumer Report Without Any Contemporaneous Authorization**
**(Against UPS and SambaSafety)**

51. Plaintiff incorporates all preceding paragraphs.

52. Section 1681b(b)(2)(A) requires, before a consumer report is procured for employment purposes, a clear and conspicuous standalone written disclosure and the consumer's written authorization. Authorization must precede procurement. There is no provision in the FCRA for retroactive authorization.

53. On February 9, 2022, SambaSafety procured a consumer report on Plaintiff at UPS's direction under account E7577 (Control Number BSR2QI), with a blank reference field and no authorization document logged against the pull. At the moment of procurement, no 2022 authorization existed, no compliant standalone disclosure had ever been made, and the only arguably applicable document — the 2010/2011 applicant-at-hire Onboarding Disclosure — did not extend to annual employment-phase procurement. This was a complete absence of authorization at the moment of procurement.

54. The August 19, 2022 signature, extracted under economic duress six months after the procurement, is void as authorization for the reasons set forth in Paragraphs 34 through 37 and cannot cure the violation.

55. The violation was willful within the meaning of 15 U.S.C. § 1681n, as established by: (a) the May 9, 2022 internal admission that the demanded signature was not required by federal law; (b) UPS's actual written notice of Plaintiff's specific FCRA citation on July 18, 2022; (c) UPS's rejection of Plaintiff's signed, fully DOT-compliant prior-year certification solely because it lacked the consumer report authorization; (d) the execution of the pull on the standing automated annual batch date, without regard to authorization status; (e) the extraction of a retroactive signature UPS knew to be legally ineffective; and (f) UPS's production of a fabricated 'separate disclosure' document in response to Plaintiff's statutory demand. *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007).

56. As a direct and proximate result of this violation and UPS's enforcement of it — the removal of Plaintiff from service for refusing retroactive consent, the conditioning of reinstatement on validating the unauthorized procurement, and the ensuing adverse actions — Plaintiff suffered the actual damages set forth in the Damages section below, recoverable under 15 U.S.C. §§ 1681n and 1681o.

**COUNT II**
**Violation of 15 U.S.C. § 1681b(b)(2)(A)**
**Procurement of Consumer Reports Without Compliant Standalone Disclosure**
**(Against UPS)**

57. Plaintiff incorporates all preceding paragraphs.

58. UPS procured consumer reports regarding Plaintiff for employment purposes without ever providing a clear and conspicuous disclosure in a document consisting solely of the disclosure. None of the three authorization documents identified in Paragraphs 16 through 22 satisfies the standalone requirement. Each annual MVR pull conducted under a defective authorization constitutes a separate willful violation, including the timely 2022 procurement cycle and, subject to the tolling allegations in Paragraphs 48 through 50, each documented procurement from 2011 forward.

59. UPS's violations were willful as established by: (a) the May 9, 2022 internal admission; (b) UPS's possession and use of a true standalone disclosure form at hire — demonstrating that UPS understood the requirement and chose not to follow it during employment; (c) twelve years of reliance on an applicant-at-hire authorization for continuous employment-phase procurement; (d) operation of a consumer reporting account with a fictional phone number and a blackhole email address, confirming no individual authorization review occurred; (e) UPS's sworn MCAD admission that it negotiated a deal with the union around the very form it simultaneously characterized as a mandatory compliance requirement; and (f) the rejection of Plaintiff's DOT-compliant certification described in Paragraphs 29 through 31.

**COUNT III**
**Violation of 15 U.S.C. § 1681b(b)(3)**
**Adverse Action Without Pre-Adverse Action Notice**
**(Against UPS)**

60. Plaintiff incorporates all preceding paragraphs.

61. Section 1681b(b)(3) requires that before taking adverse action based in whole or in part on a consumer report procured for employment purposes, the employer provide the consumer a copy of the report and a written description of the consumer's FCRA rights.

62. The 2022 adverse actions were based in part on the 2022 consumer report cycle. Plaintiff was removed from service for refusing to authorize the very report UPS had already procured and held; his reinstatement was conditioned on executing the authorization validating that report; UPS personnel reviewed and relied upon Plaintiff's MVRs in fitness determinations through the named-reviewer certification process; and the September 23, 2022 removal rested on a determination that Plaintiff was 'not safe to drive' — the precise assessment the annual MVR program exists to inform — made while UPS held the unauthorized February 9, 2022 report.

63. UPS received the pre-adverse-action notice requirement printed on the face of every LexisNexis report from 2011 forward, and FCRA notice language on the face of every

HireRight report. Despite at minimum eleven years of printed notice on its own consumer reports, UPS took the adverse actions described herein without ever providing Plaintiff a copy of any consumer report or a description of his FCRA rights. The violation was willful.

**COUNT IV**
**Violation of 15 U.S.C. §§ 1681e(a) and 1681b(b)(1)(A)**
**Failure to Maintain Reasonable Procedures to Assure Permissible Purpose**
**(Against LexisNexis, HireRight, and SambaSafety)**

64. Plaintiff incorporates all preceding paragraphs.

65. Section 1681e(a) requires every consumer reporting agency to maintain reasonable procedures designed to avoid violations of § 1681b. Section 1681b(b)(1)(A) permits a consumer reporting agency to furnish a consumer report for employment purposes only if the person procuring the report has certified compliance with the disclosure and authorization requirements of § 1681b(b)(2). A consumer reporting agency may not rely on a certification it has reasonable grounds to disbelieve, and may not treat the structural impossibility of compliance as compliance.

66. HireRight failed to maintain reasonable procedures when it established and operated an 'Annual MVR User Only' batch processing account for UPS with a fictional telephone number [(918) 555-5555] and a blackhole email address, enabling fully automated mass procurement with no individual authorization review. On information and belief, no per-procurement certification of § 1681b(b)(2) compliance existed for the batch pulls; alternatively, any blanket certification was one HireRight had reasonable grounds to disbelieve, because a non-human account submitting simultaneous requests across an entire workforce is structurally incapable of the individualized disclosure-and-authorization verification the certification represents. HireRight's reports stated on their face that the contents were consumer reports furnished under the federal FCRA for permissible employment purposes — demonstrating HireRight's knowledge of the governing requirements.

67. SambaSafety failed to maintain reasonable procedures when it processed UPS's February 9, 2022 request under account E7577 with a blank 'Reference:' field — no authorization document logged against the pull — and furnished Plaintiff's consumer report with no documented authorization record, on the standing automated annual batch date. On information and belief, SambaSafety possessed no certification, document, or record identifying any authorization supporting the February 9, 2022 procurement.

68. LexisNexis failed to maintain reasonable procedures when it furnished MVR reports to UPS under account 990059MNC without verifying that compliant standalone disclosures and valid authorizations existed before each pull. LexisNexis's own reports printed the FCRA pre-adverse-action requirement on their face, demonstrating LexisNexis understood the governing FCRA obligations, yet LexisNexis implemented no pre-furnishing authorization verification.

69. Each CRA Defendant's conduct was willful, or in the alternative negligent, and Plaintiff is entitled to relief under 15 U.S.C. §§ 1681n and 1681o.

## DAMAGES

70. **Statutory damages.** Under 15 U.S.C. § 1681n(a)(1)(A), Plaintiff is entitled to statutory damages of not less than $100 and not more than $1,000 per willful violation. The timely violations include, at minimum: the February 9, 2022 procurement without any contemporaneous authorization; SambaSafety's furnishing of that report; the standalone-disclosure violation embodied in the 2022 cycle and the void August 19, 2022 authorization; and each 2022 adverse action taken without pre-adverse-action notice. If equitable tolling applies, the documented record establishes at minimum nine discrete consumer report procurements (two LexisNexis 2011, four HireRight 2017–2020, two SambaSafety 2021–2022, with the February 9, 2022 no-authorization procurement independently actionable), and UPS's own review certifications confirm additional

procurements in 2012–2016 not produced. Discovery will establish the complete number of violations.

71. **Actual damages.** Plaintiff's actual damages, proximately caused by the violations and by UPS's enforcement of them — including the removal of Plaintiff from service without pay beginning April 2022 for refusing retroactive consent to an unauthorized procurement, and the conditioning of his employment on validating that procurement — include: lost wages of approximately $110,000 annually from his April 2022 removal from service through the present, less the brief August–September 2022 return period; loss of pension and benefits accumulation; loss of his home; dissolution of his marriage; loss of personal property including family heirlooms; and severe ongoing emotional distress. Actual damages are available under both §§ 1681n and 1681o.

72. **Punitive damages.** Under § 1681n(a)(2), Plaintiff is entitled to punitive damages. The combination of: the May 9, 2022 internal admission of non-compliance; the fictional phone number and blackhole email account; the fabricated 'separate disclosure' document; the rejection of Plaintiff's signed DOT-compliant certification; the extraction of a void retroactive authorization under economic duress; the coordinated routing of Plaintiff's federal claims into channels incapable of adjudicating them; the FCRA notices printed on the face of the LexisNexis and HireRight reports UPS received for over a decade; and the February 9, 2022 pre-authorization pull followed by removal from service for refusing retroactive consent — establishes the reckless disregard required under *Safeco*.

73. **Costs and fees.** Under §§ 1681n(a)(3) and 1681o(a)(2), Plaintiff is entitled to costs and, in the event of representation, reasonable attorney's fees. Plaintiff proceeds pro se and preserves this right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Peter VanAmburgh Jr. respectfully requests that this Court enter judgment in his favor and against all Defendants and award:

(A) A declaration that UPS violated the FCRA, 15 U.S.C. §§ 1681b(b)(2)(A) and 1681b(b)(3), through the conduct described herein, and that the August 19, 2022 signature is void as FCRA authorization;

(B) A declaration that LexisNexis, HireRight, and SambaSafety violated 15 U.S.C. §§ 1681e(a) and 1681b(b)(1)(A) by failing to maintain reasonable procedures to assure permissible purpose before furnishing consumer reports to UPS;

(C) Statutory damages of not less than $100 and not more than $1,000 per violation for each willful violation established at trial;

(D) Actual damages in an amount determined at trial, including lost wages, benefits, and all consequential losses;

(E) Punitive damages in an amount sufficient to punish and deter UPS's and the CRA Defendants' willful and reckless disregard of Plaintiff's federal consumer protection rights;

(F) An injunction requiring UPS to: (i) immediately cease any procurement of consumer reports regarding Plaintiff; (ii) provide Plaintiff with a complete accounting of all consumer reports and investigative consumer reports procured regarding him from 2010 to the present, through any channel, including LexisNexis, ChoicePoint, HireRight, and SambaSafety; and (iii) destroy all reports procured under defective, void, or nonexistent authorizations;

(G) An order requiring LexisNexis, HireRight, and SambaSafety to provide Plaintiff with a complete accounting of all requests received from UPS for consumer reports regarding Plaintiff, including all certifications and authorization documents provided by UPS in support of each request;

(H) Costs of this action and attorney's fees as the Court deems appropriate;

(I) Pre- and post-judgment interest as provided by law; and

(J) Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Peter VanAmburgh Jr. demands a trial by jury on all issues so triable.

Respectfully submitted,

Peter VanAmburgh Jr.
Pro Se
70 Ferry Road
Salisbury, Massachusetts 01952
Tel: (978) 429-6672
Email: petervanamburgh@gmail.com

Dated: June, 17, 2026

**VERIFICATION**

I, Peter VanAmburgh Jr., state under the penalties of perjury under the laws of the United States of America that I am the Plaintiff in the above-captioned matter, that I have read the foregoing Complaint, and that the factual allegations contained therein are true and correct to the best of my knowledge, information, and belief.

Peter VanAmburgh Jr.

Dated: June, 17, 2026